**SIGNED THIS: October 27, 2011**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CLARENCE POWELL and | ) | |
| BETTY J. POWELL, | ) | No.  08-82538 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| I NEED CASH, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 09-8007 |
| | ) | |
| BETTY J. POWELL, | ) | |
| | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter is before the Court after trial on the complaint filed by I NEED CASH, INC., the Plaintiff (PLAINTIFF), against Betty J. Powell, the Defendant (BETTY), seeking a determination that the loan made to her three days before bankruptcy is nondischargeable under sections 523(a)(2)(A) and (a)(2)(B) of the Bankruptcy Code.

On September 19, 2008, BETTY executed an installment loan and security agreement with the PLAINTIFF, to obtain a small loan of $1,500, agreeing to repay it in ten installments of $319.89 each, with the first payment to be made on October 10, 2008. The agreement provides that the loan's annual interest rate is 395.00%. Consistent with the PLAINTIFF'S practices and as security for the loan, BETTY presented it with five post-dated checks, to be utilized if she failed to timely make a payment on the loan. The loan agreement contained the following provision in the paragraph headed Customer's Representations and Warranties:

> You further represent and warrant that you are not a debtor under any proceeding in bankruptcy, insolvency, or reorganization and that you have no intention to file a petition for relief under any chapter of the United States Bankruptcy code.

BETTY and her husband, Clarence Powell (individually "Clarence"; together the "Debtors"), filed a joint Chapter 13 petition on September 22, 2008. According to the Certificate of Counseling, BETTY received her credit counseling briefing at 8:53 a.m. on September 22, 2008. On their schedules, which were not filed until October 10, 2008, they listed a 2007 Lincoln Town Car, valued at $24,000 and a leased 2006 Ford Pickup, valued at $22,000. The Lincoln Town Car had been purchased by Clarence on March 26, 2007, within 910 days of the filing of the petition. The Statement of Financial Affairs, filed that same day, discloses that the Debtors paid their attorney a fee of $726 and court costs of $274 on September 26, 2008. At the time of the bankruptcy filing, Clarence was an over-the-road truck driver and BETTY was working four different jobs totaling over sixty hours per week.

The Debtors' plan proposed to pay $650 per month for sixty months, with the claim

of Ford Motor Credit Company (FMCC) secured by the Lincoln Town Car being bifurcated into a secured claim for $24,000 with interest at 7%, with the balance of the claim, filed in the amount of $50,139.82, treated as unsecured. The Debtors rejected the lease of and surrendered the Ford Pickup. The PLAINTIFF objected to confirmation, contending that the Debtors had not filed the plan in good faith. FMCC also objected to the plan, based upon the failure to provide for full payment of its claim, as contrary to the unnumbered hanging paragraph located immediately following section 1325(a)(9) of the Bankruptcy Code. The Court issued its ruling on April 1, 2009, sustaining FMCC'S objection and denying confirmation of the plan. The Debtors appealed that ruling.[1] The District Court issued its order on February 12, 2010, affirming this Court's decision. During the pendency of that appeal, the Debtors' attorney was permitted to withdraw.[2] The Debtors' appeal of the District Court's decision was dismissed by the Seventh Circuit Court of Appeals for their failure to comply with the court's briefing requirements. The Debtors' petition to appeal that ruling was returned to them by the United States Supreme Court, as having been untimely filed. Thereafter, the Debtors and FMCC reached an agreement and their original plan, amended to provide for payments of $1,115 per month for the remaining twenty-seven months of the plan, was confirmed on August 9, 2011.

The PLAINTIFF filed this adversary proceeding, seeking to have the debt declared

---

[1] The Debtors' contention that the Lincoln was acquired for business use and thereby not subject to the so-called "hanging paragraph," was rejected by the Court. With respect to the PLAINTIFF'S objection to confirmation, the Court noted that even if the loan had been fraudulently obtained, that fact alone would not result in a determination that the plan had been filed in bad faith. Given the Court's finding that FMCC'S claim secured by the Lincoln could not be birfurcated, the good faith issue became moot.

[2] The stated grounds for the withdrawal was a breakdown in the attorney/client relationship. Shortly thereafter, the Debtors retained a second attorney in July, 2009. That attorney was also permitted to withdraw in October, 2010, on the same basis. The Debtors remained unrepresented until the day of trial. At trial, BETTY believed that she had located an attorney in Southern Illinois through a debt resolution firm. She had not spoken with the attorney, however, and the trial proceeded with BETTY representing herself.

to be nondischargeable pursuant to section 523(a)(2)(A), alleging that through a false representation or actual fraud BETTY obtained the loan in order to have funds to pay her attorney to file bankruptcy. Alternatively, the PLAINTIFF sought a determination of nondischargeability under section 523(a)(2)(B), claiming that the statement that she did not intend to file for bankruptcy was a statement made in writing respecting her financial condition. At the trial held on October 4, 2011, BETTY and Steven Kendall, a part owner of PLAINTIFF, were the only witnesses.

BETTY testified that she sought the loan from PLAINTIFF because they had gotten behind in their payments to FMCC. She had borrowed money from PLAINTIFF on two prior occasions and paid back the loan each time. At the time that the loan in question was obtained, the default on the truck was approximately $850 and they were behind about $950 on the Lincoln.[3] After she obtained the loan, she went directly to the bank around the corner from the PLAINTIFF'S place of business in LaSalle and cashed the check. BETTY testified that she then went to Walmart in Princeton, where she resides, to make a wire transfer of $1,000 to FMCC. When she advised Clarence of the payment, he told her that he thought FMCC could place a lien on their property, including their home. Because they did not want to jeopardize their home over a vehicle, they decided to file bankruptcy. BETTY admitted that she had filed a Chapter 7 petition in the early 1990s after losing her job and that she and Clarence had filed for Chapter 13 relief in 1995.

According to BETTY'S testimony, she obtained the loan from the PLAINTIFF prior

---

[3]Claim #1-1, filed by FMCC on its claim secured by the pickup, listed the arrears at $1,547.18. Claim 3-1, secured by the Lincoln Town Car, did not list the amount of arrears.

4

to conferring with a bankruptcy attorney. She had no intention of filing bankruptcy at that time. BETTY stated that Clarence had made the first contact with the attorney. She testified that when he telephoned the attorney to make an appointment, he was advised that the Debtors needed to receive the necessary credit counseling before they came in to meet with him. According to the certificate filed with the Court, both Debtors completed the counseling by 9:00 a.m. on September 22, 2008, which was a Monday. BETTY denied having signed a bankruptcy petition prior to having taken the credit counseling and she stated that it was her recollection that they did not meet with the attorney on that day. She believed that she went to the attorney's office the following Friday, September 26, 2008. She was certain that she met with the attorney on a Friday, because she was unable to work that day, due to the appointment. When she went into work the following Monday, she was advised that she no longer had a job, due to her failure to appear for work on the previous Friday.

**ANALYSIS**

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir. 1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654 (1991). To further the policy of providing a debtor a fresh start in bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).

Section 523(a)(2) of the bankruptcy Code provides as follows:

> (a) A discharge . . . does not discharge an individual debtor from any debt–
>
> * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> > (B) use of a statement in writing–
> > > (i) that is materially false;
> > > (ii) respecting the debtor's or an insider's financial condition;
> > > (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
> > > (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2).[4]  This exception to discharge is comprised of two separate parts.  The first component, section 523(a)(2)(A), excepts from discharge a debt for obtaining money or property by false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.  11 U.S.C. § 523(a)(2)(A).  The scope of this provision, which excepts debts arising out of "false pretenses, false representation or actual fraud," is not limited to frauds involving misrepresentations or misleading omissions.  Rather, the exception encompasses "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another."  *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000).

The second component, section 523(a)(2)(B), requires a written statement "respecting a debtor's . . . financial condition" in order to result in a determination of nondischargeability.  In *In re Cassel*, 322 B.R. 363 (Bankr.C.D.Ill. 2005), this Court interpreted that term

---

[4]Although debts incurred through fraud were previously dischargeable in a Chapter 13 case, that is no longer true following BAPCPA'S 2005 amendment to section 1328(a)(2).

narrowly, limiting such statements to financial-type statements, such as balance sheets, income statements or similar documents from which one's overall financial picture could be ascertained.

The PLAINTIFF'S claim under section 523(a)(2)(B) is based upon its contention that BETTY'S written representation that she had no intention of filing a bankruptcy petition at the time she obtained the loan was false. That representation, contained in the installment loan and security agreement, clearly does not qualify as a statement respecting her current financial condition, for purposes of this exception to discharge. The installment loan and security agreement contains no information as to BETTY'S overall net worth or income and liabilities and no evidence was presented that BETTY submitted a personal financial statement. If the PLAINTIFF is to prevail on its nondischargeability claim, it must be under section 523(a)(2)(A). This Court's determination that BETTY'S representation that she had no intention of filing bankruptcy does not constitute a statement respecting her financial condition which is encompassed by section 523(a)(2)(B), leaves the door open to its claim under section 523(a)(2)(A), which expressly excludes statements respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523 (a)(2)(A).

In this Court's view, however, BETTY'S written representation that she had no intention to file bankruptcy is entitled to no weight whatsoever in establishing the dischargeability of PLAINTIFF'S debt. Putting aside for the moment the truth or falsity of that representation, it is tantamount to a prepetition waiver of the right to a discharge in bankruptcy.[5] Considering whether a debtor's promise not to file bankruptcy could serve as the basis for a fraud claim under section 523(a)(2)(A), the court in *In re Sasse*, 438 B.R. 631

---

[5] *See Klingman v. Levinson*, 831 F.2d 1292 n.3 (7th Cir. 1987) (it is against public policy for a debtor to contract away the right to a discharge in bankruptcy).

7

(Bankr.W.D.Wis. 2010), noting that prepetition waivers of discharge or a promise not to file bankruptcy are not enforceable, queried whether, given that nonenforceability, a creditor could come into bankruptcy complaining that he relied on that promise to his detriment. Answering that question, the court stated:

> A prepetition waiver of discharge "undermines the purpose of the Code." [*In re Cole*, 226 B.R. 647, 654 (9th Cir.BAP 1998)]. The same must be said of a prepetition promise not to file bankruptcy at all, which is essentially the same as a promise to forego the primary benefit afforded by filing. [*In re Huang*, 275 F.3d 1173, 1177 (9th Cir. 2002)](debtor's promise "not [to] enter bankruptcy" was unenforceable). Logically, it seems inappropriate to find that a debtor's breach of a promise not to seek a discharge could serve as the grounds for a fraud claim when the debtor was simply exercising a statutory right. Indeed, in *Minor* the court reached this very conclusion, finding that a debtor's breach of a promise not to seek discharge of a state court judgment did not constitute misrepresentation. 115 B.R. at 696 (the creditor's argument that the debtor's conduct amounted to misrepresentation was not persuasive). At best, [the creditor] obtained an unenforceable promise from the debtor not to file bankruptcy. Turning that unenforceable promise into the basis of a nondischargeability claim would itself seem to undermine the purpose of the code, which is to grant debtors a discharge in all but those few cases in which fraud is clearly proven.

438 B.R. at 647. This Court agrees with that analysis.

The elements of proof of a traditional cause of action for fraud involving a false representation include that (1) the debtor made a representation; (2) the representation was made at a time when the debtor knew the representation was false; (3) the debtor made the representation with intent to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained a loss as a proximate result of the representation having been made. Ordinarily, a fraudulent misrepresentation must relate to a past or existing fact, and may not be based upon a failure to perform a promise or an agreement to do something at some future time. Only where the debtor never intended to perform

8

at the time he made the promise will the misstatement of intention constitute a fraudulent misrepresentation. *Palmacci v. Umpierrez*, 121 F.3d 781, 786-87 (1st Cir. 1997); *Milwaukee Auction Galleries, Ltd. v. Chalk*, 13 F.3d 1107, 1109 (7th Cir. 1994); *In re Alicea*, 230 B.R. 492 (Bankr.S.D.N.Y. 1999). Where an affirmative representation is not present, the creditor must prove that (1) the debtor perpetrated a fraud against the creditor; (2) the debtor acted with an intent to defraud; and (3) the creditor sustained loss or damage as a proximate cause of the fraud. *McClellan v. Cantrell; In re Lee,* 304 B.R. 344 (Bankr.N.D.Ill. 2004).

Apart from the written representation discussed above, the PLAINTIFF contends that BETTY engaged in a scheme of premeditated fraud by obtaining the loan for the sole purpose of paying her bankruptcy attorney and the costs of filing the petition. This theory is not based on any representation made by BETTY, other than an implied representation of repayment. A broken promise to pay a debt does not, without more, render the debt nondischargeable. *In re Tellam*, 323 B.R. 661 (Bankr.N.D. Ohio 2005). The PLAINTIFF must establish that at the time the loan was obtained there existed no intent on the part of the debtor to repay the debt. *In re Harrison*, 301 B.R. 849 (Bankr.N.D. Ohio 2003). Whether the PLAINTIFF'S allegations are tested under the traditional elements of false representation or a *McClellan*-type analysis, the PLAINTIFF must prove that BETTY acted with the intent to deceive. *In re Hanson*, 432 B.R. 758 (Bankr.N.D.Ill. 2010).

An intent to deceive may be established through circumstantial evidence and inferred from the totality of the evidence presented. *In re Kucera*, 373 B.R. 878 (Bankr.C.D. Ill. 2007). Proof of intent must be measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the funds or other property from the

9

creditor. *In re Monroe*, 304 B.R. 349 (Bankr.N.D.Ill. 2004). Here, the PLAINTIFF'S entire case is based on timing. Relying on BETTY'S testimony that she did not meet with her attorney on Monday prior to taking the credit counseling, the PLAINTIFF contends that she must have met with an attorney and actually signed the petition prior to obtaining the loan from PLAINTIFF on the previous Friday afternoon. According to BETTY'S testimony, she obtained the loan from the PLAINTIFF prior to conferring with a bankruptcy attorney. She stated that she had no intention of filing bankruptcy at that time. Rather, she fully intended to repay the loan.

      The PLAINTIFF did not call the Debtors' attorney as a witness and presented no evidence that BETTY met or communicated with the attorney prior to the loan in question. BETTY testified that all contact with the attorney occurred after the loan was made. Her testimony was credible and is supported by the representations contained in the filed documents indicating that the petition was not signed until September 22, 2008, the attorney was not paid until after the filing and the schedules were not prepared until several weeks thereafter.

      The Court perceived BETTY to be an unsophisticated but honest person. This Court finds BETTY'S testimony overall to be forthright and credible, despite her failure to specifically recall when she signed the petition. While an attorney would ordinarily require the payment of the filing fee prior to the petition being filed, the record reflects that the Debtors' attorney advanced the filing fee, and that the petition, filed without the required schedules or statement of financial affairs, was filed on an emergency basis.

BETTY testified that she obtained the loan for the purpose of curing a default with FMCC to stave off the threatened repossession of their vehicles. The PLAINTIFF introduced no evidence to contradict BETTY'S testimony that immediately upon receiving the loan proceeds, she wired FMCC the sum of $1,000 to apply against the arrearage. No evidence was presented that Mr. Kendall even asked BETTY what she intended to do with the borrowed funds, much less that she lied about it. Contrary to the PLAINTIFF'S supposition, no evidence was presented that BETTY used any portion of the borrowed funds to pay her bankruptcy attorney his fees or to pay the bankruptcy filing fee.

Based upon the uncontradicted evidence in the record, the Court finds that at the time BETTY obtained the loan from PLAINTIFF, she had no present intention to file for bankruptcy relief. Given this Court's determination that BETTY did not intend to deceive the PLAINTIFF, it does not reach the question of whether the PLAINTIFF satisfied the reliance element of section 523(a)(2)(A). However, the record would not support such a finding. Mr. Kendall, PLAINTIFF'S representative, testified that he relied on BETTY'S past dealings with the PLAINTIFF and her track record of paying off her two prior loans, as well as the post-dated checks which she had tendered.

Judgment will be entered in favor of the Defendant and against the PLAINTIFF. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###